# EXHIBIT A

Location:  Lanett , Alabama
Entity No. 88844
Unit No.:  1999

## SUPER 8 MOTELS, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated *July 12 2000*, is between **SUPER 8 MOTELS, INC., a South Dakota corporation** ("we", "our" or "us"), and **HIMAT INC., a Georgia Corporation** ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

This transaction involves the transfer of an existing Chain Facility at the Location first granted to **Shiv Shakti Inc.,** ("Prior Franchisee") in a Franchise Agreement with us dated **June 11, 1996** (the "Prior Agreement"). You assume and obligate yourself to perform any and all of the obligations (financial and otherwise) of the Prior Franchisee under the Prior Agreement that is not paid or performed as of the date of this Agreement, including without limitation, the obligation to pay any unpaid Royalties, System Assessment Fees or other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement.

1.    **License.** We have the exclusive right to license and franchise to you the distinctive "Super 8" System for providing economy lodging motel services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The License is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Super 8 Motel" and you may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion.

2.    **Protected Territory.** We will not own, operate, lease, manage, or license anyone but you to operate a Chain Facility of the same name (Super 8 Motel) in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility other than the Facility in the Protected Territory (other than the Facility) unless we or our affiliate licenses the facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located with the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminated or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied territorial rights or agreements between the parties except as stated in this

1

Section. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.

**3.     Your Improvement and Operating Obligations.**  Your obligations to improve, operate and maintain the Facility are:

3.1     **Improvements.**  You must select and acquire the Location and the Facility and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities. You must begin improvement of the Facility no later than thirty (30) days after the Effective Date. The Facility must score 300 or fewer points (or equivalent) within ninety (90) days after the Effective Date. You must thereafter continue renovation and improvement of the Facility as the Punch List requires and pass any related quality assurance inspection within nine (9) months after the Effective Date. All improvements will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation.  If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3.1, or the Facility does not meet the post-transfer quality assurance inspection standard or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2     **Improvement Plans.**  You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to you or your lenders, contractors, employees, guests or others on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material modifications to or variations from the Approved Plans require our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3 **Opening.**  You may continue to identify the Facility as part of the System prior to completing the Improvement Obligation.

3.4     **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. If you do not manage the Chain Facility personally, you must employ a full-time general manager who will be dedicated solely to the Facility. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair,

2

replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or to lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5     **Training.** You or one of your principal owners will attend at our request, at your expense for travel, meals and lodging, and at a mutually convenient time, an orientation program of not more than 3 days held in our offices. The Facility's general manager must attend the training program described in Section 4.1 even if you employ other managers for other Chain facilities who have already received such training. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay all travel, lodging, meals and compensation expenses of the people you send for training programs, tuition, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6     **Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.7     **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.

3.8     **Inspections and Audits.** You will permit our representatives to perform quality assurance inspections of the Facility and audit your financial and operating books and records (including tax returns), particularly those relating to the Facility and any related business, with or without prior notice of the inspection or audit. The inspections and audits will commence during normal business hours, although we may observe Facility operation and accounting activity at any time. You, the Facility staff and your other agents and employees will cooperate with our inspectors and auditors in the performance of their duties. You will pay us any underpayment of, and we will pay you or credit your Recurring Fee account for any overpayment of, Recurring Fees discovered by the audit. If the Facility does not pass an inspection, you refuse to cooperate with our inspectors or our auditors when they arrive for an audit at a time scheduled at least 3 business days in advance or the audit reveals that you paid us less than 97% of the correct amount of Recurring Fees for a fiscal

3

year or longer, you will pay us the Audit Fee described in Section 4.8, or the reasonable costs of travel, lodging and meal expenses for reinspection and any reinspection fee we may impose. We may publish or disclose the results of quality assurance inspections.

3.9    **Reports and Accounting.** You will prepare and submit timely monthly reports containing the information we require about the Facility's performance during the preceding month. You will prepare and submit other reports and information about the Facility as we may reasonably request from time to time or in the System Standards Manual. You will prepare and maintain any reports required under the System Standards Manual in the Facility's property management or reservation computer system, including the name and address of Facility guests, if collected, and send them to us or allow us to access them by means of a telephone datalink. You will allow us access to the reports and data stored on the Facility's property management or reservation computer system via telephone, provided that we will not unreasonably interfere with normal functioning of the property management or reservation computer system. You will maintain accounting books and records in accordance with generally accepted accounting principles and the American Hotel & Motel Association Uniform System of Accounts for Hotels, as amended, subject to this Agreement and other reasonable accounting standards we may specify from time to time. You will prepare and submit to us if we so request your annual and semi-annual financial statements. If your financial statements are audited, you will send us a copy of your audited statements if we ask for them.

3.10    **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Super 8 Motels, Inc., Cendant Finance Holding Corporation and Cendant Corporation, their successors and assigns as additional insureds.

3.11    **Conferences.** You or your representative will attend each Chain conference and pay the System Conference Fee we set for the Chain franchisees, if and when we determine to hold a System conference. The Fee will be the same for all U.S. and Canadian facilities that we franchise. You will receive reasonable notice of a Chain conference.

3.12    **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13    **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Super 8 Motels" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners. You will refer any guest that the Facility cannot accommodate to the nearest Chain Facility unless and until the guest expresses a preference for a different lodging facility. You will participate in any Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.

4

3.14    **Credit Card Programs.** You recognize that the Super 8 "VIP Card" credit card program is an integral part of the System. You will participate in the VIP Card program and other proprietary credit card programs we may require from time to time, subject to compliance with applicable law.

3.15    **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each additional guest room you may add to the Facility over 120 rooms. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.16    **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

4.    **Our Operating and Service Obligations.** We will provide you with the following services and assistance:

4.1    **Training.** We will offer the orientation program described in Section 3.5. Between 30 days prior to the projected Opening Date and 6 months afterwards, we will offer at a location in the United States we designate, and your representative (usually the general manager) must complete, a training program to our satisfaction. The training program will not exceed three weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. We charge a tuition of $250.00 for each manager trainee or other employee who attends the program. Any replacement general manager of the Facility must complete the training program within the time specified in the System Standards Manual. You must pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits. We may conduct additional mandatory or optional training for your employees, including, subject to the availability of our training personnel, an optional property opening orientation at the Facility. We may charge reasonable tuition for these additional programs. We may offer or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. A portion of the Advertising and Reservation Fund proceeds, determined in our sole discretion, will be allocated to our training activities and related direct and indirect overhead expenses.

4.2    **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use System Assessment Fees as specified in Schedule C, allocated in our discretion from the Advertising and Reservation Fund, for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer to or accept from

5

callers to our general consumer, toll-free telephone number in the United States reservations for any lodging facilities other than Chain Facilities. We may use funds in the Advertising and Reservation Fund to reimburse our reasonable direct and indirect costs, overhead or other expenses of operating the Reservation System.

4.3     **Marketing.**

4.3.1     We will use System Assessment Fees, allocated in our discretion from the Advertising and Reservation Fund, to promote public awareness and usage of Chain Facilities by implementing appropriate international, national, regional and local advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of System publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. System Assessment Fees may reimburse us or an affiliate for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement the Advertising and Reservation Fund or to advance funds to pay for System marketing activities. We do not promise that you or the Facility will benefit directly or proportionately from System marketing activities.

4.3.2     We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3     We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for separate fees in addition to the System Assessment Fee, for any resulting group booking accepted at the Facility.

4.3.4     We will publish the Chain Directory. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We may assess a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4     **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5     **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the

6

circumstances.

4.6    **Consultations and Standards Compliance.**  We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct.  We will provide telephone and mail consultation on matters of Facility operation and marketing through our representatives.

4.7    **System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications.  We will lend you one copy of the System Standards Manual promptly after we sign this Agreement.  We will send you any System Standards Manual revisions and/or supplements as and when issued.  We will send you all other publications for Chain franchisees and all separate policy statements in effect from time to time.

4.8    **Inspections and Audits.**  We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection.  We may impose a reinspection fee and will charge you for our costs as provided in Section 3.8.  You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8.  We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005.  Our inspections are solely for the purposes of checking compliance with System Standards.

5.    **Term.**  The Term begins on the Effective Date and expires on the day prior to the twentieth anniversary of the Opening Date.  Some of your duties and obligations will survive termination or expiration of this Agreement.  You will execute and deliver to us with this Agreement a notarized Declaration of Franchise Agreement (the "Declaration") in recordable form.  We will countersign and return one copy of the Declaration to you.  We may, at our option, record the Declaration in the real property records of the county where the Facility is located.  The Declaration will be released at your request and expense when this Agreement terminates or expires and you perform your post-termination obligations. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6.    **Application and Initial Fees.**  We have received from you a non-refundable Application Fee of $1,000.00.  You will pay us a non-refundable Initial Fee in the amount of $5,000.00 when you sign this Agreement, which is fully earned when we sign this Agreement.

7.    **Recurring Fees, Taxes and Interest.**

7.1    You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) 15 days after the month in which they accrue, without billing or demand.  Recurring Fees include the following:

7.1.1    A "Royalty" equal to five percent (5%) of Gross Room Sales of the Facility

accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

    7.1.2    A "System Assessment Fee" as stated in Schedule C to be paid into the Advertising and Reservation Fund, accrues from the Opening Date until the end of the Term, including during suspension periods. Upon 60 days written notice, we may change the System Assessment Fee after the tenth anniversary of the Effective Date to cover costs as described in Schedule C or to cover the cost of additional services or programs for Chain Facilities. At our option, you will also pay or reimburse us for travel and other agent commissions paid for reservations at the Facility and other fees levied to pay for reservations for the Facility originated or processed through other reservation systems, the Internet and networks. We may charge a reasonable service fee for this service.

7.2    "Taxes" are equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State. You will pay Taxes directly to us when due.

7.3    "Interest" is payable on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid. Interest is payable when you receive our invoice.

7.4    If a Transfer occurs, your transferee or you will pay us a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

## 8.    Indemnifications.

8.1    Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2    You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion,

because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any effect on parties other than you and the complaining party in the matter, or could serve as a precedent for other matters.

8.3    We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1  **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2  **Public Offerings and Registered Securities.**  You may engage the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $25,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3  **Conditions.**  We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new

9

franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as we reasonably determine, if the Facility achieves a score of less than "Satisfactory" on its most recent Quality Assurance inspection. We will provide a Punch List of improvements we will require after we receive the transferee's Application. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10.    Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11.    Default and Termination.**

11.1    **Default.** In addition to the matters identified in Section 3.1, you will be in default under this Agreement if (a) you do not pay us when a payment is due, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you

otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed, or, in the case of quality assurance default, you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection to cure the default within 90 days after the inspection. We may terminate this Agreement if you do not perform that improvement agreement.

11.2    **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Super 8 Motel", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, (11) you or any of your Equity Interest owners contest in court the ownership or right to license or franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3    **Casualty and Condemnation.**

11.3.1   You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate the License, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If the License so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as a transient lodging facility after the Casualty.

11

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.3.3  The exclusive territory covenants in Section 2 will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4    **Our Other Remedies.**  If you violate your covenant in Section 2, we may reduce the Protected Territory to the Location. We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All Reservation System User Fees accrue during the suspension period. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may deduct or assess points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. If needed, our consent or approval may be withheld while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5    **Your Remedies.**  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12.    **Liquidated Damages.**

12.1    **Generally.**  If we terminate the License or this Agreement under Section 11.2, or you terminate the License or this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and System Assessment Fees during the immediately preceding 36 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less). If the Facility has been open for fewer than 36 months, then the amount shall be the average monthly Royalties and System Assessment Fees since the Opening Date multiplied by 36. You will also pay any applicable Taxes assessed on such payment. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000.00 multiplied by the number of guest rooms in the Facility. If we terminate this Agreement under Section 3 before

12

the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement are not affected.

12.2 **Condemnation Payments.** If a Condemnation occurs, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2 or until the Condemnation occurs, whichever is longer. If the Condemnation is completed before the one year notice period expires, you will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the 12 month period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). If the Condemnation is completed after the one year notice period expires you will pay no Liquidated Damages, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

12.3 **Exclusions.** The amount of System Assessment Fees used in the computation of Liquidated Damages shall exclude travel agent commissions, airline reservation system charges and related handling charges.

**13.   Your Duties At and After Termination.** When this Agreement terminates for any reason whatsoever:

13.1 System Usage Ceases. You will immediately stop using the System to operate and identify the Facility. You will remove all signage bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove distinctive System trade dress, color schemes and architectural features.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Sales accruing while the Facility is identified as a "Super 8 Motel", including the System Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3    **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4    **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.9 (as to information relating to the Term, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14.    Your Representations and Warranties.** The parties disclaim making or relying upon any representation, promise, covenant, or warranty, express or implied, oral or written, except as expressly stated in this Agreement. You expressly represent and warrant to us as follows:

14.1    **Quiet Enjoyment and Financing.**    You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2    **This Transaction.** You have received, at least 10 business days prior to execution of this Agreement and making any payment to us, our current Uniform Franchise Offering Circular for prospective franchisees. Neither we nor any person acting on our behalf has made any oral or written representation or promise to you that is not written in this Agreement on which you are relying to enter into this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement. You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.

14.3    **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you

14

except as expressly stated in this Agreement.

## 15.    Proprietary Rights.

15.1    **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement.  You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2    **Inurements.**  All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.  No good will shall attach to any secondary designator that you use.

15.3    **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.    We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4    **Confidential Information.**    You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.  You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).  You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.  Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15

15.5    **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

## 16.    Relationship of Parties.

16.1    **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2    **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17.    Legal Matters.

17.1    **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2    **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective.

17.3    **Notices.** Notices will be effective if in writing and delivered by facsimile transmission with confirmation original sent by first class mail, postage prepaid, by delivery service, with proof of delivery, or by first class, prepaid certified or registered mail, return receipt requested, to the

16

appropriate party at its address stated below or as may be otherwise designated by notice. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Your name:       Himat Inc.
Your address:   3530 North Henry Blvd., Stockbridge, Georgia 30281
                        Attention: Dhirajlal Patel
Your fax No.:   (770) 389-3344

**SUPER 8 MOTELS, INC.**
Our address:    1 Sylvan Way, Parsippany, New Jersey 07054-0278,
                        Attention: Vice President-Franchise Administration
Fax No.:           (973) 496-5359

17.4    **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement. You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.5    **Miscellaneous.** This Agreement will be governed by and construed under the laws of the State of New Jersey. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey. This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only. We may unilaterally revise Schedule C under this Agreement after the date such changes may be effected, as provided in Schedule C. This Agreement, together with the exhibits and schedules attached, is the entire agreement (superseding all prior representations, agreements and understandings, oral or written) of the parties about the Facility.

17.6    **Waiver of Jury Trial. The parties waive the right to a jury trial in any action related to this Agreement or the relationship between the franchisor, the franchisee, any guarantor and their respective successors and assigns.**

17.7    **Special Acknowledgments.**

17.7.1  **You received our Uniform Franchise Offering Circular ("UFOC") for prospective franchisees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us. You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.**

17.7.2  **Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based on any**

17

DEC-20-2000  13:37        AN. ADMIN. DEPT.                                    P.03/03

oral or written representation or promise not stated in this Agreement.

17.7.3 This Agreement, together with the exhibits and riders attached, is the entire agreement superseding all previous oral and written communications, agreements and understandings of the parties about the Facility and the License.

17.7.4 You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

17.7.5 You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

18.    Special Stipulations.  The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1  Your Additional Termination Right.  You may terminate the License without cause or penalty effective only on the five (5) year anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you comply with the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 275 (or an then equivalent) on a quality assurance inspection and then fails to achieve a score of 275 or less (or then equivalent) in a reinspection to be performed no sooner than 30 days after the initial inspection.

18.2  Our Additional Termination Right.  We may terminate the License without cause or penalty effective only on the five (5) year anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination.  You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.

(SIGNATURE PAGE TO FOLLOW)

18

(THIS PAGE INTENTIONALLY BLANK)

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

WE:
SUPER 8 MOTELS, INC.

By: _____          Attest: _____
    C. Wayne Miller                                    Assistant Secretary
    Vice President
    Franchise Administration


YOU, as franchisee:
HIMAT INC.

By: _____          Attest: _____
    Dhirajlal Patel
    President

## APPENDIX A

### DEFINITIONS

Advertising and Reservation Fund or "the Fund" means The Super 8 Advertising and Reservation Fund into which System Assessment Fees are paid. The Fund is under our exclusive control, and shall be used by us for funding and administering, in our sole discretion, the reservation system, the training school, the "VIP Club" credit card program, national and international directories, print and broadcast media advertising, technical and professional advice, consultation and services in connection with advertising, employment of personnel and office expenses for the administration of the Fund, advertising agency commissions, and other advertising or promotional programs we establish to promote the Chain.

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

21

Declaration means the Declaration of Franchise Agreement you and we sign under Section 5.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Super 8 Motels and Super Suites facilities located outside the United States, Canada and Mexico.

Effective Date means the date that you first take possession of the Facility.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Sales means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means a one year period beginning on the Opening Date or any subsequent anniversary of the Opening Date and ending on the day preceding the next anniversary of the Opening Date.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 2314 South Broad Avenue, Lanett, Alabama 36863, as more fully described in Schedule A.

Losses and Expenses means all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for

"Super 8 Motel" and other marks (U.S. Reg. Nos.: 992,721; 1,691,852; 1,686,653; 1,706,143; 1,602,723; 1,343,591, and 1,768,824) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Protected Territory means the area within ¼ mile at I-85 between it's intersections with Exit 70 ( Rt. 83) and exit 1 (Rt. 18) in Georgia.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fee means the aggregate of all fees charged under Section 7.1.2 to pay for the cost of the System's marketing, advertising, Reservation System, training and other services.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Rules of Operations Manual, the Trademark Identification Standards Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

25

"We", "Our" and "Us" means and refers to Super 8 Motels, Inc., a South Dakota corporation, its successors and assigns.

## SCHEDULE A

(Legal Description of Facility)

## SCHEDULE B

PART I:        YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|------------------------|
| Dhirajlal Patel | 50% | Common Stock |
| Chandrakant Patel | 50% | Common Stock |

PART II:        THE FACILITY:

Primary designation of Facility: Super 8 Motel

Number of approved guest rooms: 25

Parking facilities (number of spaces, description): 25

Other amenities and facilities:

PART III:        DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**



*FRANCHISOR: SUPER 8 MOTELS, INC.*
*"SCHEDULE A"*
*PUNCHLIST FOR CHANGE OF OWNERSHIP*
*NOVEMBER 16, 1999*

---

### FACILITY
Super 8 Motel #1999
2314 South Broad Avenue
Lanett, AL

### OWNER/APPLICANT
Bati Patel
(334) 644-8888

### Q.A. REPRESENTATIVE
Robby Witcher

### TIER
Motel

### GUEST ROOMS
25

### FRANCHISE ADMINISTRATION
Diane Bolton
(973) 496-7990

## PROPERTY CONDITION SUMMARY

This 35-year old, 2-story, double-loaded, exterior corridor property is constructed of concrete block with stucco finish. The property is split with Days Inn which consist of 60 rooms. The property is located on I-85 exit 79 in the business district of Lanett.

Some renovations of building exteriors, public areas, and guestrooms are required. In addition some landscaping upgrades will be required in front area of the guestroom building.

|                        | EXISTING | STANDARD |
|------------------------|----------|----------|
| Lobby Dimension:       | 121SF    | 220SF    |
| Guest Room Dimensions: | 240SF    | 264SF    |

## COMPLETION TIME
All items listed in this punchlist must be completed within 120 days of the new license agreement unless otherwise noted.



2

Super 8 Motel #1999
Lanett, AL

## PROPERTY EXTERIOR

1. **The Design and Development Department must approve all exterior renovation plans prior to commencement of work. Written approval must be obtained from the Design and Development Department for all exterior renovation plans prior to the commencement of work. The architect or general contractor must provide these plans. The Company reserves the right to require additional renovations prior to opening if written approval of renovation plans was not obtained, or the actual renovations vary materially from the approved plans. For assistance with design concepts, contact the Design/Development Department at (973) 496-2525. Renovate to include:**

   a. Install a new exterior finish system on south end of building such as stucco, synthetic stucco or similar to conceal brick facade. Ensure new finish coordinates with current finish system.

   b. Pressure wash/chemically clean existing building façade to eliminate stains and discoloration. In addition repair any damaged areas.

   c. Construct staircase tower in back of guestroom building and incorporate Company design features. Ensure new tower coordinates with existing towers.

   d. Paint building exteriors (doors, soffits, railings and stairwells).

   e. Pressure wash/chemically clean walkways and stairwell steps to eliminate discoloration and stains.

2. Hotpatch, reseal and stripe parking lot. Resurface badly cracked and damaged areas. In addition paint curbing to eliminate scuffs and discoloration.

3. Currently property shares swimming pool with Days Inn. Pool was closed at time of inspection. At time of season opening, pool area, furniture, and safety package must meet Company specifications.

4. Landscape upgrades must be professionally designed and executed. Renderings, plans and contracts are to be provided to the Design and Development Department. The Company reserves the right to require additional landscape upgrades prior to opening if written approval is not obtained, or if the agreed upon plans are not fully executed. Provide additional islands/beds concentrating on walkways and perimeter.



3

Super 8 Motel #1999
Lanett, AL

## PUBLIC AREAS

1. The owner is responsible to provide facilities to assist the handicapped in accordance with Local, State and Federal codes, regulations and ordinances.

2. Ensure stairwell(s) and corridor(s) are equipped with emergency and exit lighting with a backup power source.

## PROJECT POWER UP REQUIREMENTS

1. Project Power Up Property Management System (PMS) is required.
   a. Dot matrix printers will require a paper hole for the bottom feed of forms.
   b. A space for the file server must be made in the front desk area or in an area which is accessible 24-hours a day including the ability for the night auditor to utilize it.
   c. Space must be located near the file server for any interface equipment that will be needed, i.e.: call accounting and Point of Sale (POS) terminals. When considering the placement of this equipment remember that it will need electrical outlets and that the interface vendor will need to run cable from the interface equipment to the Property Management System (PMS).

2. Hardware power requirements are as follows:
   a. Proper electrical connections must be in place or the Property Management System will not be installed. Refer to the Project Power Up Installation Guide for specifications.
   b. One Uninterrupted Power Supply (UPS) unit will be supplied with the Power Up Package. The UPS must be placed at least three feet from the file server.
   c. The file server and its monitor will plug into the UPS using 2 of its power outlets.
   d. Each workstation will require 2 power outlets.
   e. Each printer and modem will require 1 power outlet each.
   f. The UPS will require 1 Dedicated power outlet on its own dedicated circuit breaker.



4

Super 8 Motel #1999
Lanett, AL

## PROJECT POWER UP REQUIREMENTS CONTINUED

g.  Telephone line requirements are as follows: Two dedicated telephone lines with their own phone numbers are required. Three are recommended. No other modems, fax machines, etc are to be connected to these phone lines. For the third phone line, used for Internet access, we will allow a line to run through your phone switch.

h.  Two modems will be supplied with the Project Power Up Package.

4.  Interface vendors must be contacted in advance to insure that they will meet the Power Up requirements. The franchisee is responsible for arranging any required interface upgrades that may be necessary and for the testing of these upgrades.

5.  All cable must be from a Company approved vendor. Refer to the Project Power Up Installation Guide for specifications.

6.  All questions regarding selection of one of the approved systems are to be handled by Jeff Goad. He may be reached at 602-389-3992 or by email at Jeff.Goad@Cendant.com.

## GUESTROOMS/BATHS (Rooms Inspected) 109,111,108,119,211,212,214

1.  Renovate guestrooms to include the following:

a.  All furniture, finishes and fixtures must coordinate with other room furnishings.

b.  Replace carpet where worn, stained or matted. Company requires minimum 26 ounce cut pile carpet with padding Carpet must also be wall to wall.

c.  Replace furniture package to include leisure chairs. New casegoods to include a minimum of one credenza/armoire', a framed wall mirror, one headboard per bed, and a nightstand is required. A minimum of one writing surface is required to consist of either a writing desk or an activity table. Two chairs (one armed) per room are required. Chairs must be fabric covered. Presently, all rooms are equipped with mismatched and assorted styles.

d.  Upon replacement of wall vinyl, relocating electrical outlets will be required to conceal cords and wires. In the interim, provide cord covers.

e.  Deep clean and re-grout bath flooring.



5

Super 8 Motel #1999
Lanett, AL

## GUESTROOMS/BATHS CONTINUED

2.    Company requires that all properties maintain housekeeping at the highest levels. We
strongly recommend that the property implement housekeeping training programs to
ensure customer satisfaction.



6

Super 8 Motel #1999
Lanett, AL

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND DO NOT BIND THE FRANCHISOR.  ANY AND ALL REVISIONS TO THIS
PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY
ASSURANCE DEPARTMENT.

This Punchlist identifies items that require action due to meet the Franchisor's standards.  The
Franchisor does not warrant that completion of the items on this Punchlist will cause the
converting facility to be in compliance with any applicable federal, state, local codes, ordinances
or regulations.  You (and your architect, contractor and engineer, if applicable) are solely
responsible for conforming the Facility to the requirements of federal, state and local codes,
ordinances and regulations that may apply to your site.

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on
the date specified.  The owner is responsible for meeting all Franchisor Standards.  All repairs,
replacements and improvements must cause the item to meet or exceed the Franchisor's standards
published in the Standards of Operation and Design Manual.

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of the
facility changes materially or the License (Franchise) Agreement to which this is attached is
executed more than 90 days after the date of the Punchlist.  Note, that ordinary wear and tear,
particularly during busy seasons, may result in the need for additional work to meet entry
standards of the Franchisor.

This is not a License (Franchise) Agreement; the Company is not bound by this punchlist unless
and until the Company signs the License (Franchise) Agreement for the inspected facility.

**Note:**  Any item on this Punchlist that is not required prior to the new license agreement will
continue to be evaluated for appearance and condition during any and all Quality
Assurance evaluations conducted in the interim period.

1999 S8 CO



## SCHEDULE C
**March 1999**

The System Assessment Fee is equal to three percent (3%) of Gross Room Sales, and is paid into the Advertising and Reservation Fund. The System Assessment Fee is a recurring, non-refundable payment. All or any part of Fund proceeds received during an accounting period need not be disbursed within that accounting period.

If you elect to participate in optional Internet reservation programs, you will be charged a fee per net reservation originated through the Internet, which is currently $2.50, that we may change in our discretion. We may charge additional fees for creating or modifying the Facility's Website, Webpage or performing other services.

Notwithstanding the above, upon 60 days written notice, after the tenth (10th) anniversary of the Effective Date of this Agreement, and at any later times, System Assessment Fee may be increased, in our sole discretion, on a Chain-wide basis to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs or the cost of additional services or programs.

29

## GUARANTY

To induce Super 8 Motels, Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Section 17.4 (Remedies, Choice of Venue and Consent to Jurisdiction) and 17.6 (Waiver of Jury Trial), applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:

GUARANTORS:

_____ (Seal)
Dhirajlal Patel

_____ (Seal)
Chandrakant Patel